UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| OSCAR SALINAS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PALO ALTO UNIVERSITY, et al.,<br><br>　　　　Defendants. | Case No. 5:15-cv-06336-HRL<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 65, 88 |

Pro se plaintiff Oscar Salinas sues over his 2013 dismissal from the Doctor of Philosophy in Clinical Psychology program at Palo Alto University (University). He alleges that his academic supervisor, Dr. Amanda Fanniff, gave him a low evaluation that misrepresented his work and abilities. Salinas further alleges that, during administrative proceedings, he was denied an opportunity to present evidence and that the University failed to conduct a proper investigation. Plaintiff contends that the subsequent decision to dismiss him from the University was arbitrary and capricious and was made in retaliation for his complaints about Fanniff. The University maintains that it did not act in an arbitrary or capricious manner, but simply exercised sound academic judgment.

Plaintiff initially sued the University, plus a number of its faculty and staff, asserting claims for breach of contract, conspiracy, fraud, negligent misrepresentation, and violation of

California Education Code § 94367. Jurisdiction is based on diversity, 28 U.S.C. § 1332.

The court dismissed the individual defendants, as well as the conspiracy and fraud-based claims. The only remaining defendant is the University. The only remaining claims are for breach of contract, breach of the implied covenant of good faith and fair dealing, and for violation of California Education Code § 94367.

The University timely moved for summary judgment on January 31, 2017. Several days later---and nearly one month after the deadline for bringing fact discovery disputes before the court---plaintiff filed a motion to compel fact discovery and also requested an extension of time to file his own summary judgment motion. The discovery motion was not brought in compliance with this court's standing order re discovery disputes, and the court found no good cause for plaintiff's requested extension. Nevertheless, the court held defendant's summary judgment motion in abeyance and adjusted the scheduling order to allow additional time for adjudication of plaintiff's discovery dispute and to permit him to file his own motion for summary judgment.

Now before the court are the parties' cross-motions for summary judgment. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the court denies plaintiff's motion and grants defendant's motion.[1]

**BACKGROUND**

Unless otherwise indicated, the following facts are undisputed:

The University is an accredited, private, nonprofit educational institution, with an emphasis in the behavioral and social sciences. The student body is comprised primarily of graduate students pursuing masters or doctoral degrees in psychology and counseling.

Salinas enrolled in the University's Ph.D. Clinical Psychology Program in Fall 2010. He was dismissed from the program in the Spring of 2013.

Upon his matriculation, plaintiff was given a copy of the University's Ph.D. Program Student Handbook ("Handbook"). The Handbook describes the core objectives of the program---basically, all of which are aimed at producing competent, ethical, and professional clinicians.

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

2

(Dkt. 65-1, Declaration of William J. Froming ("Froming Decl.") ¶¶ 15-16, Ex. A (Dkt. 65-10 at ECF p. 60)).

Section 5.11 of the Handbook provides that students are evaluated upon both personal and professional conduct at the University:

> ***In a clinical psychology training program, evaluations of competence must be based not only on academic achievement but on personal and professional qualities as well***. These include a commitment to self-understanding and self-awareness and a capacity for good relationships. The two are obviously related; understanding and acceptance of others depend in part on understanding and acceptance of ourselves. ***Students are expected to demonstrate maturity, good judgment, discretion, and respect***. If their effectiveness is compromised by personal problems or illness, they are expected to seek competent professional help to determine whether to suspend, terminate, or limit the scope of professional studies at PAU.

(Id. (Dkt. 65-10 at ECF p. 28)) (emphasis added). Additionally, the Handbook states that faculty will work closely with students as mentors and advisors:

> All students admitted to the Ph.D. program are expected to complete their graduate degrees and the faculty work closely as mentors and advisors so students graduate in a timely fashion. Communication between students and faculty advisors is vital . . ..

(Id., (Dkt. 65-10 at ECF p. 28)).

As part of the Ph.D. Clinical Psychology Program, all students are required to have supervised clinical experience, or "practicum." The first part of this training begins in the second year of the program at the Kurt & Barbara Gronowski Psychology Clinic ("Gronowsky Clinic" or "Clinic"). The Clinic is a community-based psychology training clinic and treatment center. Students work at the Clinic under the supervision of University faculty, who assess, critique, and evaluate each student's performance. Students are evaluated on a form using a 5-point scale, with "5" being the highest rating ("Advanced/Skills comparable to excellent performance at internship level") and "1" being the lowest ("Needs remedial work"). Evaluations typically are completed at the end of the quarter. (Dkt. 65-2, Declaration of Amanda Fanniff ("Fanniff Decl.") ¶¶ 30-31, 47, Ex. B).

According to the Handbook, "[d]eficiencies in any of three general areas of [the University's] clinical training (academic course work and progress toward degree, professional

behavior, and conduct of research) may lead to students being placed on probation, suspended, or dismissed." (Froming Decl. ¶ 21, Ex. A (Dkt. 65-10 at ECF p. 95)). To make satisfactory academic progress, students are expected to do a number of things, including "[p]erform at an adequate level in research, internship training, clinical progress (practicum & internship), academic progress, or dissertation . . .." (Id.). And, "[i]n cases of extreme or persistent difficulties," a student may be dismissed for a number of reasons, including "[f]ailure to maintain the clinical competencies and professional conduct appropriate for [a] student enrolled in a graduate clinical training program, including behavior that poses serious risks (e.g., behavior resulting from psychosis, or other psychopathology or active dependence on substances, etc.) to clients, research subjects, faculty, staff, or colleagues (note that an adequate academic record cannot compensate for impaired or unethical professional behavior)." (Id. at ECF pp. 98-99).

There are two University committees responsible for overseeing students: the Clinical Training Committee ("CTC") and the Student Evaluation Committee ("SEC"). (Froming Decl., ¶ 13). The Handbook identifies procedures for addressing concerns about student progress, including review by the CTC and SEC, and appeal to the University Internal Appeals Committee ("IAC"). (Id. ¶¶ 22-23 & Ex. A).

Salinas began his clinical training at the Gronowski Clinic in September 2012. His immediate supervisor was Dr. Amanda Fanniff. The next-in-line supervisor was Dr. Sandra Macias, the Clinic's director. In evaluating plaintiff's clinical work, Fanniff says she concluded (based on videotape review, client assessment, and written progress notes) that he was not performing adequately in two areas: (1) his ability to establish rapport with patients, known as "therapeutic alliance"; and (2) his ability to make effective use of faculty supervision and supervisory feedback. For example, she claims that:

- In one instance, she was told by clinic managers that Salinas left a patient at the front desk during a risk assessment consultation. This was problematic because plaintiff would have needed to consult with a supervisor in a private therapy room, and leaving the patient at the front desk could cause the patient to become confused, anxious, or embarrassed.

4

- In another instance, she reviewed a video of a therapy session and found that Salinas "appeared dismissive with a client." That is, Fanniff says plaintiff talked for long periods of time without giving the client an opportunity to speak and "communicated in other ways which [she] thought showed that he needed to improve his therapeutic clinical skills." She said this was a pattern she observed in several sessions.

(Fanniff Decl., ¶¶ 33-36).

By October, Fanniff expressed to Macias concerns about plaintiff's supervision. (Dkt. 65-3, Declaration of Sandra Macias ("Macias Decl.") ¶ 35). Specifically, Fanniff reported that Salinas would argue with her and become very defensive whenever she provided feedback or made any suggestions. (Id.; Fanniff Decl. ¶ 40). This led Fanniff to believe that plaintiff was unwilling to accept faculty constructive criticism. (Fanniff Decl. ¶ 40).

Fanniff met with plaintiff on October 30, 2012 for individual supervision and to review the patient session in which she formed the opinion that he was "dismissive" and "harsh" with the client. She says she gave him feedback on how to improve his skills. (Fanniff Decl. ¶ 38). When plaintiff disagreed with her assessment, Fanniff agreed to go over the video again the following week. (Dkt. 69 Declaration of Oscar Salinas ISO Opp. to MSJ ("Salinas Opp. Decl.") ¶ 4, Ex. Q (Dkt. 68-2 at ECF pp. 87-88).

On November 6, Fanniff and Salinas met again to review the video of the therapy session in which Fanniff concluded that plaintiff was "harsh" and "dismissive." She says she again provided him with feedback for improvement. (Fanniff Decl. ¶ 39). Salinas challenged Fanniff on her assessment and says he told her he was "scared" because he was going to need a recommendation from her, and he felt that things were not going well between them. (Salinas Opp. Decl. ¶ 4, Ex. Q (Dkt. 68-2 at ECF p. 88)).

Plaintiff says that the following week, Fanniff "was kinder" during a November 13 supervision session, even praising him on some things. (Id.). However, he claims that at the very end of the session, as he was preparing to leave, Fanniff told him that he was being defensive in supervision and that, in the future, if he became argumentative, she would tell him to stop talking. (Id.). Salinas felt this parting comment was unprofessional on Fanniff's part and was an attempt by her to "muzzle" him. (Id. ¶ 7, Ex. N (Dkt. 68-2 at ECF p. 49)).

5

During the next week's supervision session (November 20), Salinas claims that just as he started to respond to one of Fanniff's comments, she stopped him from talking and (allegedly, "with an impish grin" and in a "gleeful" manner) said, "No, no, that's what I mean." (Salinas Opp. Decl., Ex. Q at ECF p. 87).

Fanniff maintains that during her meetings with Salinas, he continued to be defensive and argued with her whenever she provided a suggestion or feedback on his clinical training. (Fanniff Decl. ¶ 40). At some point, Fanniff told plaintiff that he would be receiving a "1" rating on his forthcoming evaluation. She says that her individual supervision sessions with plaintiff varied in the degree to which he was defensive and argumentative; but, over the course of the fall semester, she concluded that Salinas' competency in establishing therapeutic alliance and in accepting faculty constructive feedback did not improve sufficiently to warrant a higher rating. (Id. ¶ 41). Macias concurred with Fanniff's evaluation. (Macias Decl. ¶¶ 36-37).

Salinas requested a meeting with both Fanniff and Macias to discuss his performance.

Fanniff and Macias met with plaintiff on November 28. They reviewed some recordings of plaintiff's therapy sessions, and Macias agreed with Fanniff's evaluation of his performance. In their view, "how [Salinas] was acting with his clients is kind of how he was acting in supervision . . . . that he would get a little bit annoyed with clients if they weren't kind of going along with his interpretation." (Salinas Opp. Decl. ¶ 15, Ex. D (Dkt. 68-1 at ECF p. 17)). Macias says that she provided Salinas with feedback and suggestions for improvement, and that plaintiff's response "was to assert that both Dr. Fanniff and I were wrong in our evaluation and he proceeded to argue with both Dr. Fanniff and I." (Macias Decl. ¶ 38). Macias says she attempted to explain why she did not see things the way he did, but Salinas "was defensive and continued to argue with me." (Id.). Both Macias and Fanniff aver that plaintiff appeared to be angry and was verbally argumentative throughout the meeting. (Id.; Fanniff Decl. ¶ 43).

On December 10, Salinas sent an email to Macias, titled "The Story of My Supervision," in which he explained why he thought Fanniff was wrong about his clinical performance. (Salinas Opp. Decl., Ex. Q; Macias Decl. ¶ 39). In reflecting on the matter, Salinas concluded that Fanniff must have felt a need to exert dominance over him; and, to his way of thinking, she had been

6

trying to compete with him (e.g., by offering, in group discussions, analyses of patient behavior that differed from those he offered). Additionally, plaintiff came to believe that Fanniff had (in a very subtle manner) attempted to manipulate him into saying certain things during supervisory sessions in order to make him look bad. For example, Fanniff says she observed that plaintiff appeared to be anxious in therapy sessions (which she said is very typical among beginning students) and tried to provide suggestions about managing his anxiety in session in order to more effectively connect with the client. (Fanniff Decl. ¶ 63, Ex. L (Dkt. 65-10 at ECF p. 154)). Salinas believes that Fanniff was, in fact, trying to get him to say that he would never be anxious and would never make mistakes, in order to make him look arrogant. (Salinas Opp. Decl., Ex. Q at ECF pp. 84-85). In sum, Salinas said that Fanniff was flat-out wrong about him and questioned her competency and ethics as a supervisor. (Salinas Opp. Decl., Ex. Q).

Macias forwarded plaintiff's December 10 email to (1) Dr. Robert Russell, the Director of the CTC; and (2) Dr. Jim Breckenridge, the Dean of Academic Administration and Operations. (Macias Decl. ¶ 40). She says that she did so "because [she] was concerned that Plaintiff was reacting to the feedback of his clinical training in a manner that reflected an inability to use faculty feedback." (Id.).

Additionally, after discussing the matter with Clinic Assistant Directors, Macias (together with those directors) agreed that it was best to assign Salinas to another supervisor for the upcoming winter quarter. She says she made this decision because, given Salinas' views about Fanniff, he likely would not benefit from her supervision. And, Macias wanted to give Salinas another opportunity at getting supervisory feedback from another supervisor. (Macias Decl. ¶ 41).

On December 11, Macias met with Salinas in her office and advised him of the supervisor change. Dr. Nancy Huang would supervise him for the remainder of the fall quarter, and he would be reassigned to Dr. Yotam Heineberg for the following quarter. (Macias Decl. ¶ 42). Several days later, in a December 14 email, Macias advised Salinas that he needed to submit information about his clinic hours and that, upon receipt of that information, Fanniff would complete his forthcoming evaluation for the Fall semester. (Id. ¶ 43).

In her evaluation form, Fanniff gave plaintiff a "2" rating on most factors and a "Not

7

Applicable" on others. According to the evaluation form, a "2" rating is the "[m]ost common rating for beginning practica" and signifies "[p]erformance consistent with other entry-level practica students." (Fanniff Decl. ¶ 47, Ex. B at ECF p. 106). A "Not Applicable" rating means that the particular skill/objective was "Not applicable for this training experience/Not assessed during training experience." (Id.). As discussed above, Fanniff gave plaintiff a "1" on "Therapeutic Alliance," meaning that he "Alienates patients, fails to communicate empathy, and/or deficient in ability to recognize problems in therapeutic relationship. Fails to discuss therapeutic relationship in supervision." (Id. ¶ 48, Ex. B at ECF p. 112). She also gave him a "1" rating on "Uses Consultation/Supervision Productively," signifying that plaintiff is "Frequently defensive and inflexible; resists important and necessary feedback." (Id. ¶ 49, Ex. B at ECF p. 107). In one of the comments sections, Fanniff noted:

> He has had some difficulty in making effective use of supervision. Oscar initially presented as defensive when provided with feedback regarding his sessions. In discussion, it became clear that he felt he was explaining why he had done what he did at the time and did not realize that this appeared argumentative and defensive. After this conversation, Oscar's responsiveness to supervision improved, but he has continued to have difficulty accepting alternative perspectives on his performance. This has been apparent in individual supervision as well as in a joint meeting with Dr. Macias.

(Fanniff Decl. ¶ 50 & Ex. B). At the end of the evaluation form, Fanniff stated: "Oscar is performing at an appropriate level of skill in nearly all relevant competency areas, but needs further development in making effective use of supervision and skills related to developing the therapeutic alliance. I believe Oscar has the capability to improve upon these skills and to develop into an effective therapist." (Id., Ex. B at ECF p. 114).

Salinas did not sign the evaluation.

Because Salinas received at least one "1" rating on his evaluation and didn't sign his evaluation form, and because the school was aware of "concerns about [his] reaction to supervisory feedback and evaluation," Russell sent an email to Salinas on January 10, 2013, advising him to (1) review his evaluation with his advisor (Dr. Friedberg) ASAP and (2) attend a CTC meeting on January 14. Salinas was advised to review the Handbook before the meeting and was told that he could bring Dr. Friedberg (or anyone else he wanted) to that meeting. (Dkt. 65-4

Declaration of Robert Russell ("Russell Decl.") ¶ 43, Ex. E (Dkt. 65-10 at ECF p. 134).

The January 14 CTC meeting minutes indicate that Salinas was advised that there usually was a pool of first year practicum students that received "1" ratings and that those students usually progressed satisfactorily after some guidance. Salinas told the CTC that the "1" ratings he received were "flat out lies," and that Fanniff had been manipulative and abused him in their supervisory relationship. When asked to explain, Salinas shared his belief that Fanniff had tried to compete with him in clinical group supervisory sessions and had also tried to manipulate him into saying that he would never be anxious. The committee noted that the meeting had been called, not because plaintiff disagreed with Fanniff, but because of the way in which he expressed his disagreement. And, the committee suggested that there might be other valid viewpoints as to the reality of the situation:

> The committee asked [Salinas] to describe how he felt he presented himself in the first part of this meeting. He said he knows how bad it looked for him to say a supervisor lies. He understands, but that is how he saw it. He mentioned how Dr. Fanniff told him that he was being defensive just as he was leaving supervision and he stated, "Who does that?"
>
> The committee again pointed out his level of thought attribution and inference. They pointed to the documents he has sent out regarding the situation and how by doing so he is establishing information about what somebody's intent is. They asked if he understands the intent of what he did and how it affects other people and how they think about him, and about how they think about the supervisor. He stated that he had no choice and asked what was he supposed to do?
>
> The committee explained that students in that situation in the past had talked to the supervisor to try and get an understanding of what was happening, and if that didn't help, they would go talk to the clinic leadership and present their case, and if that didn't seem to help, they would arrange to speak to the DCT or the Assoc. DCT in order to work out an alternative, such as getting a new supervisor.
>
> The committee told Oscar that his habit of equating reality with how he views it is not warranted, particularly in clinical training. Realities pluralificate in clinical training and the more experience you get the more flexible you have to become to understand that there are very different ways of seeing the same thing. You have to have some faith in those that have been appointed to train you in that their view is in fact privileged by virtue of their training.

(Russell Decl. ¶ 53, Ex. F (Dkt. 65-10 at ECF pp. 137-38)). In the end, the CTC felt that Salinas was making unwarranted inferences about what the feelings and alleged motivations of other

9

people must be. While it noted that his "1" ratings would not necessary stop him from succeeding in the program, the committee found Salinas' characterization of events "worrisome" and concluded that "the situation ha[d] gone beyond the 1's on [plaintiff's] evaluation." (Id. at ECF p. 138).

Following the January 14 meeting, Salinas sent a series of emails to Russell and other CTC members, again explaining why he believed he was right and Fanniff was wrong, and positing various theories as to why Fanniff did what she did. (Russell Decl. ¶ 55, Ex. G (Dkt. 65-10 at ECF pp. 140-42).

On January 24, 2013, Russell wrote Salinas to advise that the CTC was continuing his suspension from work at the Gronowski Clinic and would be referring the matter to the SEC for a full review "because of unmitigated reservations concerning [his] ability to engage in clinical supervision going forward, as illustrated by your choice of responses to your clinical supervisors and CTC members during the supervisory feedback and CTC review process." (Russell Decl. ¶ 58, Ex. H (Dkt. 65-10 at ECF p. 144)).

On February 12, 2013, Dr. Nigel Field (the then-Chair of the SEC, now deceased) wrote plaintiff to advise that, pursuant to procedures set out in the Handbook, the SEC would hold a meeting on March 1, 2013 to discuss his status in the Ph.D. program. Because of the serious nature of the matter, the SEC encouraged Salinas to bring an advocate (such as his faculty advisor) and to come prepared to address the issues. (Froming Decl. ¶ 61, Ex. I (Dkt. 65-10 at ECF pp. 146-47)).

On February 25, 2013, Russell wrote plaintiff to advise that at the upcoming SEC meeting, the CTC intended to recommend that he be academically dismissed on competency grounds--- namely, that he lacked the ability to receive critique of his clinical work and to discuss that critique effectively and constructively with faculty evaluators. The letter stated that the CTC "formed this academic judgment based on your performance in the clinic and perhaps more importantly, on observation of your communications to the faculty in your reaction to your receipt of their evaluations." (Russell Decl. ¶ 59, Ex. J (Dkt. 65-10 at ECF p. 149)).

Macias and Fanniff each submitted statements to the SEC. Both discussed what they

10

perceived as Salinas' resistance to feedback and supervision, as well as their concern over the level of anger they felt he had shown. Macias, for example, pointed out that plaintiff accused her of being unethical and threatened to report her to the Board of Psychology. She was concerned by his escalation of the matter---so much so, that she said she feared for her and Fanniff's personal safety if the matter were to escalate any further, and both were advised by school administrators to work from home for the rest of the week. (Macias Decl. ¶ 55, Ex. K (Dkt. 65-10 at ECF pp. 151-52); Fanniff Decl. ¶ 63, Ex. L (Dkt. 65-10 at ECF pp. 154-55)).

The SEC proceeded with its meeting on March 1, 2013. In essence, faculty stated that they found plaintiff incapable of considering points of view other than his own. Russell, for example, noted that although plaintiff had performed well in class, with respect to his performance at the Clinic, he had "never heard of anyone so resistant to alternatives or lacking in flexibility." Plaintiff, on the other hand, maintained that he welcomed constructive criticism and felt he had no choice but to react in the way that he did because Fanniff's evaluation of him was wrong. (Dkt. 88-2 Declaration of Oscar Salinas ISO MSJ ("Salinas Decl."), Ex. W; Dkt. 65-10 Deft's MSJ, Ex. M).

On March 22, 2013,[2] Field wrote a letter to Dr. Allen Calvin (the University's President at the time), recommending that Salinas be dismissed from the program, effective immediately, due to what the SEC found to be his inability to be supervised:

> Meeting with Oscar Salinas on March 1, 2013, the SEC found that, while he is clearly capable, he is not able to be supervised in his clinical work. At his request, four faculty members of the SEC viewed videotapes of his therapy sessions. We were therefore able to independently confirm that indeed, as is true of any intern early on in training, he is in need of close clinical supervision. Given his unwillingness to constructively make use of a clinical supervisor's feedback, and noteworthy tendency to misconstrue the intent of a clinical supervisor in a negative direction, it is not possible to supervise him. In light of this, he is not suitable to be in a clinical training program. Again, it is not a matter of his competence per se that is in question, but rather his inability to be supervised.

(Russell Decl. ¶ 68, Ex. N (Dkt. 65-10 at ECF pp. 165-66)).

On April 10, 2013, Calvin wrote plaintiff to advise that he was accepting the SEC's

---

[2] Field's letter is dated "March 22, 2012," but given the context of the proceedings, that date apparently is a typographical error.

recommendation to dismiss him from the Ph.D. program, effective immediately. (Froming Decl. ¶ 69, Ex. O (Dkt. 65-10 at ECF p. 168).

Plaintiff appealed the decision to the IAC. On August 27, 2013, William Froming (University Provost) wrote Salinas to advise that the IAC would hear his appeal on September 16, 2013. Plaintiff was invited to submit materials he wished the IAC to review beforehand. (Froming Decl., ¶ 72, Ex. P (Dkt. 65-10 at ECF p. 177). Plaintiff did so, maintaining that he had always behaved calmly and professionally and was being unfairly portrayed as an angry and deranged individual. (Salinas Opp. Decl., Exs. M, N (Dkt. 68-2, ECF pp. 41-59)).

Froming avers that prior to the appeal hearing, IAC members reviewed numerous documents, including plaintiff's submissions. At the hearing, they heard testimony and also interviewed Fanniff and Macias about their interactions with Salinas. The IAC Chair, Dr. James Breckenridge, also reviewed recordings of plaintiff's client sessions. (Froming Decl. ¶¶ 76-80, Ex. R (Dkt. 65-10 at ECF pp. 196-214)).

On November 25, 2013, Breckenridge wrote a letter to Froming, stating the IAC found no basis to overturn the decision to dismiss plaintiff. The committee found no evidence that anyone at the University had treated Salinas in a significantly arbitrary, capricious, or improper manner. Although Fanniff had described plaintiff as "angry" and "frightening," the committee found no evidence that anyone had suggested that plaintiff suffered from a psychological impairment. And, despite his claims to the contrary, the IAC found that evidence about his clinical competency (including recordings of his therapy sessions) had been carefully considered and that there was no evidence that decisionmakers refused to investigate his supervisors' claims. (Froming Decl. ¶ 81, Ex. S (Dkt. 65-10 at ECF pp. 216-18)).

This lawsuit followed.

**LEGAL STANDARD**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the

pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See id. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. Id.

## DISCUSSION

### A. Contract Claims

Salinas contends that the decision to dismiss him was arbitrary and capricious because it was based on Fanniff's (allegedly unwarranted and erroneous) evaluation. He argues that the school simply endorsed Fanniff's viewpoint without conducting a proper investigation into the matter. As discussed, the University maintains that Salinas' dismissal was based on the sound academic judgment of its faculty members.

"There is a widely accepted rule of judicial non-intervention into the academic affairs of schools." Paulsen v. Golden Gate Univ., 25 Cal.3d 803, 808 (1979). "However, some courts,

including those of California on occasion, have carved out an exception to this rule by permitting limited intervention whenever it is alleged that a university or college has acted arbitrarily or in bad faith." Id. "A university may not act maliciously by arbitrarily and capriciously dismissing or refusing to award a degree to a student on the ground of academic deficiencies if said student fulfills its degree requirements." Banks v. Dominican College, 35 Cal. App.4th 1545, 1552 (1995) (quotation and citations omitted). Plaintiff's burden of establishing arbitrary and capricious conduct, however, "is a heavy one." Id. He must show that his "dismissal was without any discernable rational basis." Id.

A university's decision may be overturned only if the court "find[s] it to be arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or discriminatory factors." Banks, 35 Cal. App.4th at 1551. And, a court "must uphold the university's decision 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" Id. (quoting Regents of University of Michigan v. Ewing, 474 U.S. 214, 225, 88 L.Ed.2d 523, 532, 106 S.Ct. 507 (1985)).

For its part, the University points to Handbook provisions that state that the clinical psychology program requires students to, among other things, maintain clinical competency and "demonstrate maturity, good judgment, discretion, and respect." (Froming Decl. ¶ 16, Ex. A (Dkt. 65-10 at ECF p. 28)). Defendant also notes that in deposition, plaintiff agreed that, to perform satisfactorily as a doctoral candidate, a student must, among other things, demonstrate that they use their faculty supervisors in a productive and nondefensive manner. (Dkt. 65-9, Vartain Decl. ¶ 5, Ex. U (Salinas Depo. at 65:6-18)). He also testified that he understood the faculty's conclusion to be that he was resistant to feedback. (Id. (Salinas Depo. at 74:1-3, 104:5-8)).

Defendant has also submitted the declarations of eight of its faculty, each of whom was involved to some degree in reviewing plaintiff's grievance. In sum, they attest that:

- Faculty assessment and evaluation is an important part of helping students to improve skills and that a student's ability to effectively respond to faculty feedback and evaluation is a core threshold competency in the clinical psychology program.

14

(Froming Decl., ¶¶ 8-10, 29-31; Dkt. 65-8 (Declaration of James Breckenridge ("Breckenridge Decl."), ¶¶ 19-21; Russell Decl., ¶¶ 26-28; Macias Decl., ¶¶ 25-27; Fanniff Decl., ¶¶ 24-26; Dkt. 65-7, Declaration of Christopher Weaver ("Weaver Decl."), ¶¶ 9-11; Dkt. 65-5, Declaration of Grace Chen ("Chen Decl."), ¶¶ 25-27; Dkt. 65-6, Declaration of Luli Emmons ("Emmons Decl."), ¶¶25-27).

- A student will be unable to succeed if he is unaccepting of feedback because of defensiveness. (Froming Decl., ¶32; Breckenridge Decl., ¶22; Russell Decl, ¶29; Macias Decl., ¶28; Fanniff Decl., ¶27; Chen Decl. ¶28; Emmons Decl. Emmons, ¶28).

Faculty agree that Salinas' communications and his behavior during administrative proceedings demonstrated unprofessional behavior and showed he was not able to respond effectively to faculty assessment and feedback on his clinical skills. (Russell Decl., ¶¶ 45-64, Decl. Chen, ¶¶ 41-62, Decl. Emmons, ¶¶ 41-62, Weaver Decl., ¶¶ 23-37, Decl. Breckenridge, ¶¶ 4-18, Decl. Froming, ¶¶ 44-85, Exs. E, F, G, H, J, N, S).

The University further maintains that, as with any other student, plaintiff was given all the process that was due, namely, review by the CTC and SEC, as well as an appeal and review by the IAC. (Decl. Froming, ¶¶ 22-23, 46-81, 88; Russell Decl. ¶¶ 25, 45-64; Macias Decl., ¶ 24; Fanniff Decl. ¶23; Weaver Decl., ¶¶ 16-17, 23-42; Chen Decl. ¶¶ 24, 41-62; Emmons Decl. ¶¶ 24, 41-62; Exs. A, F, H, I, J, N, O).

Salinas insists that he has never been resistant to feedback and that he has happily accepted criticism from other faculty. He denies ever becoming so angry with Fanniff (or anyone else) as to cause them to fear for their safety. He maintains that Fanniff could not truly have reached the conclusion that he was resistant to feedback. This is because he believes that she bore quite a bit of ill will against him, as demonstrated by what he perceived to be her competitiveness and need to exert dominance over him. And, at the motion hearing, he stated his belief that Fanniff probably did not like him precisely because he was very competent. When probed by the court as to Fanniff's evaluation of him, Salinas agreed that her positive remarks about his abilities are true and correct, but he feels that her low evaluation of his skills is simply wrong and could only have

15

been the product of the bad feelings he believes she harbored for him. As for other University faculty and staff, Salinas contends that their agreement with Fanniff's assessment is nothing more than a cover-up, plain and simple.

As for evidence, Salinas submits his own declarations (in which he recounts his views of the pertinent events) as well as a number of exhibits. (Dkts. 69, 88-1). Defendant objects that the declarations contain whole passages that lack foundation and constitute inadmissible expert opinions, improper argument, and speculative and unsupported conclusions. Additionally, defendant argues that the appended exhibits (namely, the transcripts of plaintiff's patient therapy sessions) have not been properly authenticated. Fed. R. Evid. 602, 701, 702. Although defendant's evidentiary objections are well taken, the court has considered all of plaintiff's proffered evidence. Nevertheless, the court concludes that he has not presented evidence creating a genuine issue of material fact as to the alleged arbitrary and capricious nature of the University's decision to dismiss him.

Plaintiff has submitted evaluation forms in which patients gave him positive reviews, as well as transcripts he prepared of therapy session recordings, and other therapy records.[3] He also submits his transcripts, articles, and other academic records. (Salinas Opp. Decl., Exs. E, F; Dkt. 88-2, Salinas Decl. ISO MSJ ("Salinas Decl."), Exs. B, E, F, T). These, he says, establish that he did have rapport with clients and that he was competent. Additionally, because the recordings of sessions where Fanniff found him to be "dismissive" and "harsh" no longer exist,[4] Salinas argues that he is entitled to an inference that those recordings would have proved that he was not "dismissive" or "harsh" at all. However, plaintiff's own view of his therapy conduct does not create a genuine dispute of any fact material to his claims. See Banks, 35 Cal. App.4th at 1550 (stating that it is not the student's self-perception, but rather the perception of the decisionmaker

---

[3] The court granted plaintiff's motion to seal certain of these records. Plaintiff having advised that he was unable to e-file them under seal, the court directs the clerk to enter those exhibits on the docket, under seal.

[4] In discovery, defendant acknowledged that the recordings of some of plaintiff's therapy sessions had been discarded, but it submitted a declaration from Macias, who averred that those recordings were destroyed in the Fall of 2012 in the ordinary course of business, several years before the present lawsuit was filed. (Dkt. 71-1).

16

that is relevant). The record demonstrates that Salinas was not dismissed because of his work with patients, but because of the way in which he responded to faculty feedback, causing the faculty to conclude that he would not succeed in the program due to an inability to accept constructive criticism. (Froming Decl., ¶¶ 46-70; Russell Decl., ¶¶ 31-64; Weaver Decl., ¶¶ 23-42; Chen Decl., ¶¶ 30-62; Emmons Decl., ¶¶ 30-62, Exs. E-O).

In addition to some of the same documents submitted by the University (e.g., Handbook excerpts, Fanniff's evaluation, his communications with the faculty and staff, and documents pertaining to the proceedings before the CTC, SEC, and IAC), plaintiff also submits:

- A copy of his supervision contract with Fanniff (Dkt. 88-1, Salinas Decl. ¶ 3, Ex. BB). Pointing out that it required "Adherence to Agency, Legal, and Professional Standards," plaintiff argues that it is significant that the University never claimed that he violated that particular contract.
- Correspondence with another University professor, which plaintiff says shows that he has accepted faculty feedback from others. (Salinas Decl., Ex. U).
- The University's interrogatory responses, which he says demonstrate that defendant was evasive as to evidence of his lack of professionalism; failed to investigate whether he actually posed a threat to the personal safety of his supervisors; and could identify no one other than Fanniff and Macias who said that he did not welcome criticism. (Salinas Opp. Decl., Exs. H, I; Salinas Decl., Exs. I, J, Z).
- A purported excerpt from the American Psychological Association's Ethics Code, providing that psychologists must avoid harming others, including students; as well as an article pertaining generally to the evaluation of supervisees. (Salinas Opp. Decl., Ex. B; Salinas Decl. Ex. Y).

As for the resulting harm he says he has suffered, Salinas submits his law school application materials (Salinas Decl., Ex. S). Plaintiff, who currently is in his third year in law school, says that prior to his dismissal from the University, he was accepted to more law schools than he was afterward. He believes the only possible explanation is the fact that he had to disclose his dismissal in his subsequent applications. (Salinas Decl. ¶ 21). Additionally, plaintiff says that

17

he submitted an article for publication in a psychology journal, but his submission was rejected. The stated reason was that the journal's reviewers concluded that "this work is currently underdeveloped and is unlikely to have sufficient impact on the literature." (Salinas Opp. Decl., Ex. R. (Dkt. 68-2 at ECF p. 93)). Salinas disagreed with that assessment and submitted a letter appealing the rejection. (Id. at ECF pp. 94-102). But, Salinas says the editor never responded. He believes this was "because I told him I had been dismissed by the doctoral program. Clearly, [the editor] decided, prejudicially, that the University must have had good grounds to dismiss me, and that I was not worthy of a response." (Salinas Opp. Decl. ¶ 21).

In essence, plaintiff's claims boil down to the proposition that Fanniff gave him a low evaluation because she didn't like him. Ergo, under Salinas' theory, there was no good reason for the University's decision to dismiss him. But the law does not command that students obtain a degree or remain in a particular program simply because they believe themselves to be qualified. Rather, Salinas must offer evidence that would support a reasonable jury finding that there was no discernable rational basis for his dismissal. Banks, 35 Cal. App.4th at 1552. Was there that evidence? Despite its volume, plaintiff's proffered evidence deals in generalities; and, the alleged bad motives underpinning plaintiff's theory of the case relies on conjecture ladled with speculation. In sum, plaintiff has not presented any evidence that the decision to dismiss him from the clinical psychology program was based on anything other than valid academic criteria and the sound judgment of the University faculty. As to his contract-based claims, plaintiff's summary judgment motion is denied, and the University's motion is granted.

**B.     California Education Code § 94367**

Plaintiff claims that he was dismissed in retaliation for exercising free speech rights to complain about what he perceived to be Fanniff's unwarranted low evaluation and unfair supervision. California Education Code § 94367, also known as the Leonard Law, provides in relevant part:

> No private postsecondary educational institution shall make or enforce a rule subjecting a student to disciplinary sanctions solely on the basis of conduct that is speech or other communication that, when engaged in outside the campus or facility of a private postsecondary institution, is protected from governmental restriction by the First Amendment to the

18

United States Constitution or Section 2 of Article I of the California Constitution.

Cal. Civ. Code § 94367. Although there is no clear evidence that Salinas complained outside the University prior to his dismissal, courts have held that the statute does not exclude speech that occurs solely within the confines of a campus. Yu v. Univ. of La Verne, 196 Cal. App.4th 779 (2011). Even so, for the reasons discussed above, Salinas has not produced evidence raising a genuine issue of material fact that he was dismissed because of his complaints (as opposed to the manner in which he complained). Accordingly, as to this claim plaintiff's summary judgment motion is denied and defendant's motion is granted.

## ORDER

Based on the foregoing, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The clerk shall enter judgment accordingly and close this file.

SO ORDERED.

Dated: September 25, 2017

HOWARD R. LLOYD
United States Magistrate Judge

5:15-cv-06336-HRL Notice has been electronically mailed to:

Michael Joseph Vartain     mike@vartainlaw.com, charissa@vartainlaw.com, emelina@vartainlaw.com, stacey@vartainlaw.com, william@vartainlaw.com

Oscar Salinas     osalinas10@hotmail.com

Stacey Lynn Leask     stacey@vartainlaw.com, charissa@vartainlaw.com, emelina@vartainlaw.com

William Charles Teeling     william@vartainlaw.com, charissa@vartainlaw.com, emelina@vartainlaw.com